

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DARREN FINDLING, Personal
Representative of the Estate of Eli Oles,
Deceased

                Plaintiff,

vs.                                                Case No.
                                                       Hon.

United States of America,
Lakeland Immediate Care Center d/b/a
Cassopolis Family Clinic,
Lakeland Hospitals at Niles and St. Joseph, Inc.,
d/b/a Lakeland Hospital Niles
Kenneth W. Kaufmann, II MD
Karen D. Zienert, MD
Dawn Lamson, RN
Kayla Lowery, RN
Nancy Redman, RN
Melissa Smith, RN

                Defendants
_____/

MARC LIPTON (P43877)
JOEL SANFIELD (P42968)
STEFFANI CHOCRON (P45335)
LIPTON LAW CENTER, P.C.
Attorneys for Plaintiff
18930 W. Ten Mile Road
Southfield, Michigan 48075
(248) 557-1688
marc@liptonlaw.com
joel@liptonlaw.com
_____/

## **COMPLAINT AND JURY DEMAND**

      COMES NOW Plaintiff by and through counsel and for his complaint against these

Defendants, states as follows:

## PARTIES AND JURISDICTION

## INTRODUCTION

1. This is a combined FTCA and State law medical malpractice action against the Defendant United States under the Federal Tort Claims Act, (28 U.S.C. Section 2671, *et seq.)* and 28 U.S.C. Section 1346(b)(1), for professional malpractice in connection with medical care provided to Cheyenne Bennett and her now deceased child, Eli Oles by physicians and nurses employed at Lakeland Immediate Care Center (d/b/a Cassopolis Family Clinic), a Federally Qualified Health Center, and then at Lakeland Hospitals at Niles and St. Joseph, Inc (d/b/a Lakeland Hospital Niles), both located in Niles, Michigan.

2. The claims herein brought against the Defendant United States of America, Lakeland Immediate Care Center (hereinafter Lakeland ICC), and Kenneth Kaufmann II and Dawn Lamson in their capacity as employees of Lakeland Immediate Care Center are pursuant to the Federal Tort Claims Act (28 U.S.C. Section 2671 *et. Seq.)* and 28 U.S.C. Section 1346(b)(1), for money damages as compensation for personal injuries caused by the Defendants' negligence.

3. The claims herein brought against Lakeland Hospitals at Niles and St. Joseph, Inc., (hereinafter Lakeland Hospitals), and Kenneth Kaufmann II, Dawn Lamson, Karen Zienert, Kayla Lowery, Nancy Redman and Melissa Smith, individually and in their capacity as employees or agents of Lakeland Hospitals, are brought pursuant to State law, with Plaintiff requesting this Court exercise supplemental jurisdiction over the State Law claims pursuant to 28 USC Section 1367, as the combined acts of malpractice arise out of a common set of operative facts, caused a single indivisible injury and death to Plaintiff's child, and are so related to the FTCA claims, such that separation of these matters is impracticable, carries the risk of inconsistent judgments and would otherwise be a waste of judicial resources.

4. Plaintiff's Estate has fully complied with the provisions of 28 U.S.C. Section 2675 of the Federal of the Federal Tort Claims Act.

5. Plaintiff's Estate has further fully complied with the provisions of MCL 600.2912b, in that a notice of intent to file claim was sent to all parties.

6. This suit has been timely filed, in that Plaintiff's Representative timely served notice of his claim on both the United States Department of Health and Human Services and all identified parties less than two years after the incident forming the basis of this suit.

7. Plaintiff's Estate is now filing this Complaint pursuant to 28 U.S.C. Section 2401(b), 2675(a) as more than six months have passed, and the Department of Health and Human Services has not responded to the Notice of Claim. Plaintiff is deeming the failure to respond as a final denial pursuant to 28 U.S.C. Section 2675(a).

8. Further, Plaintiff's Estate is filing this Complaint in compliance with MCL 600.2912b, as more than 182 days have passed since the notice of intent to file claim was sent to all parties.

**PARTIES AND JURISDICTION**

9. Cheyenne Bennett and her child, Plaintiff's decedent Eli Oles, at all times relevant were residents Three Oaks, Berrien County in the State of Michigan.

10. Defendant United States of America is liable for the errors, acts and omissions of Lakeland ICC a/k/a Cassopolis Family Clinic and Kenneth Kaufmann and Dawn Lamson, pursuant to 42 USC 233 (g)-(h), 42 USC 233(A) and 28 USC 2679(b).

11. Lakeland ICC a/k/a Cassopolis Family Clinic, at all relevant times, is and was a Federally Qualified Health Center, doing business in the city of Niles, Berrien County, Michigan,

3

and has serving as its registered agent, Mary Geegan Middleton, address 261 M-62 Cassopolis, Mi.

12. Kenneth Kaufmann, II MD, at relevant times, was a newly board-certified physician in the field of Obstetrics and Gynecology. Further, certain errors, acts and omissions complained of occurred while he was employed by, or the agent of, Lakeland ICC and acting during the course and within the scope of that employment or agency.

13. Dawn Lamson, RN, at relevant times, was a licensed professional Registered Nurse. Further, certain errors, acts and omissions complained of occurred while she was employed by, or the agent of, Lakeland ICC and acting during the course and within the scope of that employment or agency.

14. Lakeland Hospitals at Niles and St. Joseph, Inc. d/b/a Lakeland Hospital Niles, at all relevant times, is a Michigan Domestic Corporation, with its registered agent being Mary Ann Pater, and its registered office at 1234 Napier Ave., St. Joseph, Berrien County, Michigan.

15. Kenneth Kaufman, II and Dawn Lamsom, RN, at relevant times, committed certain errors, acts and omissions complained of while acting as employees or agents of Lakeland Hospitals and acting during the course and within the scope of that employment or agency.

16. Karen Zienert, MD at relevant times, was a board-certified physician in the field of Obstetrics and Gynecology. Further, certain errors, acts and omissions complained of occurred while she was employed by, or the agent of, Lakeland Hospitals and acting during the course and within the scope of that employment or agency.

17. Kayla Lowery at relevant times, was a licensed professional Registered Nurse. Further, certain errors, acts and omissions complained of occurred while she was employed by, or

4

the agent of, Lakeland Hospitals and acting during the course and within the scope of that employment or agency.

18. Nancy Redman at relevant times, was a licensed professional Registered Nurse. Further, certain errors, acts and omissions complained of occurred while he was employed by, or the agent of, Lakeland Hospitals and acting during the course and within the scope of that employment or agency.

19. Melissa Smith at relevant times, was a licensed professional Registered Nurse. Further, certain errors, acts and omissions complained of occurred while he was employed by, or the agent of, Lakeland Hospitals and acting during the course and within the scope of that employment or agency.

20. At all times relevant to this Complaint, both Lakeland ICC and Lakeland Hospitals, their employees and agents, including the individually named Defendants, held themselves out to the Plaintiff and his mother and eligible beneficiaries, as providers of high-quality health care services with the expertise necessary to maintain the health and safety of patients like the Plaintiff and his mother.

21. This Court has original subject matter jurisdiction based upon a Federal Question being raised under the constitution and laws of the United States, pursuant to 28 U.S. § 1331 as to claims against the United States of America, Lakeland ICC and Kenneth Kaufmann II and Dawn Lamson while they were acting during the course of, and within the scope of their employment or agency with Lakeland ICC.

22. This Court has supplemental jurisdiction, pursuant to 28 USC 1367, over the remaining Defendants – Lakeland Hospitals, Karen Zienert, Kayla Lowery, Nancy Redman and Melissa Smith – because their combined acts of malpractice arise out of a common set of operative

facts, caused a single indivisible injury and death to Plaintiff's child, and are so related to the FTCA claims, such that separation of these matters is impracticable, carries the risk of inconsistent judgments and would otherwise be a waste of judicial resources.

23. The events or omissions giving rise to the Plaintiff's claims happened in the Western District of Michigan and the above-named Defendants transact business and are subject to personal jurisdiction in this district. Accordingly, venue is proper in this district pursuant to 28 U.S.C. § 1391.

24. Attached hereto are Affidavits of Merit of Dr. Scott Serden, Obstetrician/Gynecologist (Exhibit A) and Jennifer Attkinson, Nurse (Exhibit B).

## GENERAL ALLEGATIONS

25. Plaintiff incorporates all prior allegations as if fully set forth herein.

26. On 4/10/18, Cheyenne Bennett, aged 20, presented for her initial obstetrics evaluation at Lakeland ICC, d/b/a Cassopolis Family Clinic. Dawn Lamson, RN, documented her obstetrical history.

27. Ms. Bennett was 20 weeks pregnant, and she had no complaints other than some constipation and she was taking Keflex for a urinary tract infection. Her weight on this date was 157 lbs, (71.2kg) and her blood pressure was 102/76. She was taking vitamins as prescribed and was excited about the pregnancy.

28. On 4/16/18, Ms. Bennett was seen again at Cassopolis Family Clinic for a physical exam. She was assessed by Dawn Lamson, RN and Jennifer Zizzo, NP. Her blood pressure was 106/70 and her weight on this visit was 160 lbs. Urine protein and glucose were negative. She was doing well and had no concerns other than constipation, for which she was self-managing.

6

29. On 4/25/18, a fetal ultrasound showed a single live breech fetus, heart rate 153 and no abnormalities identified. Estimated due date was calculated as 8/28/18.

30. On 5/14/18, Ms. Bennett returned to Cassopolis Family Clinic for her 24 week obstetrics visit. She was assessed by Dawn Lamson, RN and Jennifer Zizzo, NP. Her weight on this date was 168 lbs, (76.2kg) and her blood pressure was 108/70. Urine protein and glucose were negative, and she had no edema. She noted good fetal movement, no contractions. She was feeling well and had no concerns. On this date, a fetal ultrasound revealed a single live cephalic fetus with a grossly normal lumbosacral spine, heart rate 152.

31. On 6/11/18, Ms. Bennett returned to Cassopolis Family Clinic for her 28 week obstetrics visit. She was assessed by Dawn Lamson, RN and Jennifer Zizzo, NP. Her weight on this date was 168 lbs, (76.2kg) and her blood pressure was 116/80. She noted good fetal movement, no contractions, no bleeding, no loss of fluids. There was trace protein noted in urine dip. Ms. Bennett reported feeling well overall, but she noted a few episodes of shortness of breath. She denied racing heart and anxiety. Her shortness of breath resolved after a short time and Ms. Zizzo instructed her to keep track if it happened again and update next visit.

32. On 7/02/18, Ms. Bennett returned to Cassopolis Family Clinic for her 31 week obstetrics visit. She was assessed by Dawn Lamson, RN and Jennifer Zizzo, NP. Her weight on this date was 191 lbs, (86.6kg) and her blood pressure was 126/86. Her urine dip showed 1+ protein. She reported good fetal movement, no contractions, no bleeding, no loss of fluids. No edema was noted. Ms. Bennett reported she was no longer short of breath. Ms. Zizzo noted "Suspect error in weight–will recheck," however there is not another weight recorded during this visit.

33. On 7/23/18, Ms. Bennett returned to Cassopolis Family Clinic for her 34 week obstetrics visit. She was assessed by Dawn Lamson, RN and Jennifer Zizzo, NP. Her weight on this

7

date was 204 lbs, (92.5kg) and her blood pressure was 150/98. Her urine dip showed 3+ protein and negative glucose, urinalysis showed protein > 600. She had +2 edema. She reported good fetal movement, no contractions, no bleeding, no loss of fluids. Dawn Lamson, RN noted that Ms. Bennett complained of a headache, "this is normal for her," but "maybe getting more often now." Ms. Zizzo noted that she called "Dr. KK" (presumably Kenneth Kaufmann) and she noted that Ms. Bennett would "go now to OB for Pre-E [pre-eclampsia] work up." Lastly, Ms. Zizzo noted "Dawn RN walked patient to OB."

34. On 7/23/18 at 10:58AM, Ms. Bennett arrived at Lakeland Hospital Niles and was admitted to The Birth Place unit, the reason for the visit was noted as "Pre-eclampsia in third trimester," the admission type was classified as urgent. Dr. Kenneth Kaufmann, MD was the admitting provider. An external fetal monitor was placed.

35. At 11:04AM, Melissa Smith, RN, noted that Dr. Kaufmann was in the room talking with Ms. Bennett. RN Smith stated that Ms. Bennett denied a current headache, but she reported frequent frontal headaches with this pregnancy that were relieved by Tylenol.

36. At 11:09, Ms. Bennett's blood pressure was 162/99.

37. At 11:10-11:15, labs ordered by Dr. Kaufmann were collected and the results were significant for WBC = 12.5 (high), Hgb 11.6 (low), neutrophils 9.4 (high). Urinalysis showed protein > 300 (very high), protein urine random result was > 600. The Protein/Creatinine Ratio was not able to be calculated due to high urine protein. Rapid drug screen was negative.

38. At 11:19AM, Dr. Kaufmann ordered a peripheral IV, which was started in Ms. Bennett's left hand by Melissa Smith, RN.

39. At 11:35, Ms. Bennett's blood pressure was 159/91.

40. At 11:49, Ms. Bennett's blood pressure was 153/88.

8

41. At 11:58, Ms. Bennett's blood pressure was 147/90.

42. At 12:05, Ms. Bennett's blood pressure was 152/101.

43. At 12:15, Ms. Bennett's blood pressure was 159/98.

44. At 12:25, Ms. Bennett's blood pressure was 151/93.

45. At 12:35, Ms. Bennett's blood pressure was 140/85.

46. At 13:00, Ms. Bennett's blood pressure was 145/105.

47. At 13:31, Dr. Kaufmann entered a progress note. He noted that Ms. Bennett was "sent from clinic for elevated BP." He noted she denied contractions, headache, visual disturbance, RUQ pain, or loss of fluid. Fetal heart tones were in the 140s with moderate variability, positive accelerations and no decelerations, category 1. Dr. Kaufmann's progress note outlines a few of the blood pressure readings on 7/23/18: 159/98 at 12:15, 151/93 at 12:25, 140/85 at 12:35, 145/105 at 13:00. Dr. Kaufmann's assessment was pre-eclampsia without severe features (CBC, CMP within normal limits) and protein/creatinine ration was pending. Dr. Kaufmann's note does not mention the positive elevated urine protein. His plan was for her to begin Labetalol 200mg bid and to follow up the next day for a second BMZ and again in 3 days in the clinic. Dr. Kaufmann noted to discharge Ms. Bennett home.

48. Dr. Kaufmann further noted that the CBC was within normal limits, but WBC = 12.5 (high), Hgb 11.6 (low), and neutrophils 9.4 (high).

49. At 13:32, Dr. Kaufmann ordered betamethasone acetate-betamethasone sodium phosphate (BMZ) 12mg IM injection.

50. No antihypertensive medications were ordered or administered to Ms. Bennett while she was a patient in The Birth Place.

51. At 14:00, Ms. Bennett's blood pressure was 140/97.

9

52. At 14:02, Nancy Redman, RN administered the BMZ injection in Ms. Bennett's left deltoid muscle.

53. At 14:10, Nancy Redman, RN removed Ms. Bennett's IV.

54. At 14:13PM, Nancy Redman, RN gave discharge instructions to Ms. Bennett regarding signs and symptoms of pre-eclampsia and need to return the next day for the second BMZ injection.

55. At 14:30, Nancy Redman, RN noted that Ms. Bennett ambulated off the floor in stable condition.

56. On 7/24/18 at 15:45, Ms. Bennett arrived back at The Birth Place to receive the second BMZ injection. Karen Zienert, MD was the admitting physician. The admitting diagnosis was gestational hypertension without significant proteinuria, third trimester.

57. At 15:47, Ms. Bennett's blood pressure was 172/88.

58. At 15:54, Dr. Zienert ordered BMZ 12mg once IM injection.

59. At 15:54, Kayla Lowery, RN administered BMZ 12mg IM injection.

60. At 15:55, Ms. Bennett's blood pressure was 152/102.

61. At 16:00, Ms. Bennett's blood pressure was 157/99.

62. At 16:05, Ms. Bennett's blood pressure was 161/95.

63. At 16:11, urinalysis showed protein > 300.

64. At 16:15, Kayla Lowery, RN entered a progress note that stated "Pt here for second Beta shot. Was in yesterday for hypertension issues. BP's are still elevated today, and urine still has Protein in it. Patient has NOT started her Labetalol yet. Is picking up script after they leave. Denies any PIH symptoms. Reinforced how important it is she starts it. Has appt Thursday. MD ok sending patient home."

65. No antihypertensive medications were ordered or administered to Ms. Bennett while she was a patient in The Birth Place.

66. At 16:24, Ms. Bennett was discharged home.

67. At 17:25, Dr. Zienert signed a discharge order with the diagnosis "PIN, without preeclampsia."

68. Despite her persistent and severely elevated blood pressure and proteinuria, Ms. Bennett was not emergently admitted to the hospital for inpatient management of pre-eclampsia.

69. On 7/26/18, Ms. Bennett presented to the Cassopolis Family Clinic for follow up with Dr. Kaufmann. Pregnancy was at 35 week. On this date, urine dip protein result was 4+, urinalysis showed protein > 300. Dawn Lamson, RN noted that Ms. Bennett's blood pressure was 152/96. She had +2 edema. RN Lamson instructed Ms. Bennett to "take Labetalol 2 tablets twice per day (400mg twice per day)."

70. A progress note entered by Dr. Kaufmann noted that Ms. Bennett had no complaints, denied contractions, loss of fluid, vaginal bleeding, vision changes, headache, or RUQ changes. Dr. Kaufmann reviewed labor and premature rupture of membrane precautions. He increased Labetalol to 400mg bid. Ms. Bennett was given a 24-hour urine collection jug. He noted that she should return to the clinic on 7/30 for NST (nonstress test) and blood pressure check.

71. Despite her persistent and severely elevated blood pressure, proteinuria, and +2 edema, Ms. Bennett was not emergently admitted to the hospital for inpatient management of pre-eclampsia.

72. On 7/27/18 at 23:00, Ms. Bennett arrived at Lakeland Medical Center via ambulance with seizures. According to the Emergency Department record authored by Dr. Joseph Longobardi, DO, "Patient found on the floor actively seizing by her boyfriend. Patient still seizing when EMS

11

arrived. 2g of mag were given by EMS with cessation of seizure in route. Patient postictal on arrival. GCS 6. Snoring respirations. Decision made to intubate the patient. Induction with ketamine and vecuronium…Patient's blood pressure in the 170 systolic upon presentation, additional grams of mag for 6 g total given as a bolus. 2 gram/hr infusion started. Patient's blood pressure responded Was in the 120s systolic after bolus of mag. Bedside ultrasound demonstrated no fetal heart rate or fetal movement." She'd been incontinent of urine and stool. Her WBC count was 32.7, neutrophils 26.5, LDH 540. The diagnosis was eclampsia.

73. After she was stabilized, Ms. Bennett was taken to the OR for a cesarean section with Dr. Ashley Dupuis, DO. In the operative report, Dr. Dupuis described "delivery of a non-viable male neonate in the cephalic presentation with fetal death pronounced per Dr. Anderson (Pediatrician). Weight: pending at this time. No gross fetal abnormalities of the baby or placenta were noted." Post-op, Ms. Bennett was transferred to the ICU for further management. Just prior to her discharge on 7/31/18, Ms. Bennett was able to hold her baby, Eli Oles, before he was taken to the funeral home.

74. As a direct and proximate result of the events outlined herein, which constitute professional negligence for the reasons set forth below, Plaintiff's decedent expired. His estate incurred medical, hospital, funeral and burial expenses during the effort to treat him and thereafter, and his Estate incurred a substantial loss of earning capacity due to his demise. Further, he suffered conscious pain and suffering, and his survivors suffered the loss of his financial support and the loss of his society and companionship, and other damages under the circumstances.

**CAUSE OF ACTION FOR MEDICAL MALPRACTICE PURSUANT TO THE FTCA**

75. Plaintiff incorporates all prior allegations as if fully set forth herein.

76. The Defendant USA, as the real party in interest for Lakeland ICC, Kenneth Kaufman II and Dawn Lamson, had a duty to provide ordinary care, and to exercise that standard and degree of care and skill required of health care providers, consistent with the expertise that the Defendant presented to the community at large.

77. The Standard of Care applicable to Kenneth W. Kaufmann, II MD and his employers, the USA and Lakeland Immediate Care Center d/b/a Cassopolis Family Clinic, as well as their successors, employees, agents and ostensible agents, in July 2018, was to:

A. Exercise that degree of reasonable medical judgment and provide appropriate medical care that a reasonable obstetrician-gynecologist would under the same or similar circumstances;
B. Recognize and document a diagnosis of preeclampsia with severe features when the systolic blood pressure is ≥ 160 mm Hg or the diastolic blood pressure is ≥ 110, with or without signs and symptoms of significant end-organ dysfunction;
C. Recognize that pre-eclampsia with severe features is a medical emergency and if not treated promptly can result in serious adverse complications, including seizures and fetal demise;
D. Perform and document a thorough and focused physical exam in a patient with known or suspected pre-eclampsia, including but not limited to evaluating for the presence or absence of clonus, auscultating lung sounds, checking oxygen saturation, and performing a pain assessment;
E. Refrain from discharging a patient from a clinic or hospital setting when she is displaying signs of pre-eclampsia with severe features;
F. Immediately admit a patient to the hospital when she is displaying signs of pre-eclampsia with severe features;
G. Recognize that pre-eclampsia with severe features is an indication for delivery at ≥ 34 weeks of gestation after maternal stabilization;
H. Recognize that in preeclampsia with severe features, seizure prophylaxis and immediate reduction of blood pressure with intravenous medications are indicated;
I. Assess and document the patient's risk factors for complications, especially the risk of seizures and fetal demise, in a patient with pre-eclampsia with severe features;
J. Accept responsibility for all errors, acts and omissions with regard to the improper care and resultant harms imposed upon claimant;
K. Other standards as shall be revealed in discovery.

78. The Standard of Care applicable to Dawn Lamson, RN, as a reasonable and prudent licensed and practicing registered nurse, when presented with a patient exhibiting signs and symptoms such as those demonstrated by Cheyenne Bennett, and the USA, Lakeland Immediate

13

Care Center d/b/a Cassopolis Family Clinic as well as their successors, employees, agents and ostensible agents, in July 2018, was to:

A. Exercise that degree of reasonable clinical judgment and provide appropriate medical care that a reasonable nurse would under the same or similar circumstances;
B. Recognize and immediately report signs and symptoms of preeclampsia with severe features, including a systolic blood pressure $\geq$ 160 mm Hg or diastolic blood pressure $\geq$ 110, with or without signs and symptoms of significant end-organ dysfunction;
C. Recognize that pre-eclampsia with severe features is a medical emergency and if not treated promptly can result in serious adverse complications, including seizures and fetal demise;
D. Perform and document a thorough and focused physical exam in a patient with known or suspected pre-eclampsia, including but not limited to evaluating for the presence or absence of clonus, auscultating lung sounds, checking oxygen saturation, and performing a pain assessment;
E. Thoroughly assess and document the patient's risk factors for complications of pre-eclampsia with severe features, including the risk of seizure and fetal demise, when a patient presents with severe hypertension, edema of the lower extremities, and proteinuria;
F. Advocate for the safety and overall wellbeing of a patient with pre-eclampsia with severe features by requesting immediate admission to an acute care setting rather than discharging the patient home;
G. Recognize that pre-eclampsia with severe features is an indication for delivery at $\geq$ 34 weeks of gestation after maternal stabilization;
H. Recognize that in preeclampsia with severe features, seizure prophylaxis and immediate reduction of blood pressure with intravenous medications are indicated;
I. Accept responsibility for all errors, acts and omissions with regard to the improper care and resultant harms imposed upon claimant;
J. Other standards as shall be revealed in discovery.

79. With regards to the care and treatment rendered to Cheyenne Bennet and Eli Oles, Kenneth Kaufmann II, Dawn Lamson, the USA, Lakeland ICC and their successors, employers, employees, agents and ostensible agents, breached the applicable standards of care.

80. As a direct and proximate result of the violations of the standards of care referenced above, Defendants USA, Lakeland ICC, Kaufmann and Ramson did not provide Cheyenne Bennett or Eli Oles appropriate treatment or arrange for emergent interventions, resulting in the progression of Cheyenne Bennett's preeclampsia and the neurologic injury and ultimate death of Plaintiff's decedent Eli Oles.

14

**CAUSE OF ACTION FOR MEDICAL MALPRACTICE AS TO THE STATE DEFENDANTS PURSUANT TO THIS COURTS SUPPLEMENTAL JURISIDICTION**

81. Plaintiff incorporates all prior allegations as if fully set forth herein.

82. Defendant Lakeland Hospitals, Kenneth Kaufman II and Dawn Lamson, Karen Zienert, Kayla Lowery, Nancy Redman and Melissa Smith had a duty to provide ordinary care, and to exercise that standard and degree of care and skill required of health care providers, consistent with the expertise that the Defendant presented to the community at large.

83. The Standard of Care applicable to Kenneth W. Kaufmann, II MD, Karen Zienert and their employers, Lakeland Hospitals, as well as their successors, employees, agents and ostensible agents, in July 2018, was to:

A. Exercise that degree of reasonable medical judgment and provide appropriate medical care that a reasonable obstetrician-gynecologist would under the same or similar circumstances;
B. Recognize and document a diagnosis of preeclampsia with severe features when the systolic blood pressure is ≥ 160 mm Hg or the diastolic blood pressure is ≥ 110, with or without signs and symptoms of significant end-organ dysfunction;
C. Recognize that pre-eclampsia with severe features is a medical emergency and if not treated promptly can result in serious adverse complications, including seizures and fetal demise;
D. Perform and document a thorough and focused physical exam in a patient with known or suspected pre-eclampsia, including but not limited to evaluating for the presence or absence of clonus, auscultating lung sounds, checking oxygen saturation, and performing a pain assessment;
E. Refrain from discharging a patient from a clinic or hospital setting when she is displaying signs of pre-eclampsia with severe features;
F. Immediately admit a patient to the hospital when she is displaying signs of pre-eclampsia with severe features;
G. Recognize that pre-eclampsia with severe features is an indication for delivery at ≥ 34 weeks of gestation after maternal stabilization;
H. Recognize that in preeclampsia with severe features, seizure prophylaxis and immediate reduction of blood pressure with intravenous medications are indicated;
I. Assess and document the patient's risk factors for complications, especially the risk of seizures and fetal demise, in a patient with pre-eclampsia with severe features;
J. Accept responsibility for all errors, acts and omissions with regard to the improper care and resultant harms imposed upon claimant;
K. Other standards as shall be revealed in discovery.

84. The Standard of Care applicable to Dawn Lamson, RN, Kayla Lowery, RN, Nancy Redman, RN, and Melissa Smith, RN as a reasonable and prudent licensed and practicing registered nurse, when presented with a patient exhibiting signs and symptoms such as those demonstrated by Cheyenne Bennett, and Lakeland Hospitals as their successors, employers and principals in July 2018, was to:

A. Exercise that degree of reasonable clinical judgment and provide appropriate medical care that a reasonable nurse would under the same or similar circumstances;
B. Recognize and immediately report signs and symptoms of preeclampsia with severe features, including a systolic blood pressure $\geq$ 160 mm Hg or diastolic blood pressure $\geq$ 110, with or without signs and symptoms of significant end-organ dysfunction;
C. Recognize that pre-eclampsia with severe features is a medical emergency and if not treated promptly can result in serious adverse complications, including seizures and fetal demise;
D. Perform and document a thorough and focused physical exam in a patient with known or suspected pre-eclampsia, including but not limited to evaluating for the presence or absence of clonus, auscultating lung sounds, checking oxygen saturation, and performing a pain assessment;
E. Thoroughly assess and document the patient's risk factors for complications of pre-eclampsia with severe features, including the risk of seizure and fetal demise, when a patient presents with severe hypertension, edema of the lower extremities, and proteinuria;
F. Advocate for the safety and overall wellbeing of a patient with pre-eclampsia with severe features by requesting immediate admission to an acute care setting rather than discharging the patient home;
G. Recognize that pre-eclampsia with severe features is an indication for delivery at $\geq$ 34 weeks of gestation after maternal stabilization;
H. Recognize that in preeclampsia with severe features, seizure prophylaxis and immediate reduction of blood pressure with intravenous medications are indicated;
I. Accept responsibility for all errors, acts and omissions with regard to the improper care and resultant harms imposed upon claimant;
J. Other standards as shall be revealed in discovery.

85. With regards to the care and treatment rendered to Cheyenne Bennet and Eli Oles, Defendant Lakeland Hospitals, Kenneth Kaufman II and Dawn Lamson, Karen Zienert, Kayla Lowery, Nancy Redman and Melissa Smith and their successors, employers, employees, agents and ostensible agents, breached the applicable standards of care.

86. As a direct and proximate result of the violations of the standards of care referenced above, Defendants Lakeland Hospitals, Kenneth Kaufman II and Dawn Lamson, Karen Zienert,

Kayla Lowery, Nancy Redman and Melissa Smith did not provide Cheyenne Bennett or Eli Oles appropriate treatment or arrange for emergent interventions, resulting in the progression of Cheyenne Bennett's preeclampsia and the neurologic injury and ultimate death of Plaintiff's decedent Eli Oles.

WHEREFORE Plaintiff requests the following relief;

A. Compensatory non-economic and economic damages including but not limited to all damages recoverable under the laws of the United States and of the State of Michigan;

B. Reasonable attorney fees, costs and interest;

C. Such other and further relief as appears reasonable and just under the circumstances.

Respectfully submitted,

/S/ STEFFANI CHOCRON_____
JOEL SANFIELD ((P42968)
STEFFANI CHOCRON (P45335)
MARC LIPTON (P43877)
Attorneys for Plaintiff
18930 W. Ten Mile Road, Ste. 3000
Southfield, MI 48075
Dated:  February 12, 2021         (248) 557-1688

## **Jury Demand**

Comes Now Plaintiff, by and through counsel, and hereby demands a trial by jury on this matter as to all claims, and against all Parties, as permitted by Law.

Respectfully submitted,

/S/ STEFFANI CHOCRON_____
JOEL SANFIELD ((P42968)
STEFFANI CHOCRON (P45335)
MARC LIPTON (P43877)
Attorneys for Plaintiff
18930 W. Ten Mile Road, Ste. 3000
Southfield, MI 48075
Dated:  February 12, 2021         (248) 557-1688